Pee Curiam.
Wilson Shields, the father of Banner, at the time of his death was possessed of a number of negro slaves, and in his will directed them and his other personal property to be sold for the payment of his debts, and the education of his children, till the youngest should arrive at the age of 16 ; the surplus to be distributed amongst his children in certain proportions. At the sale or distribution, B. Shields, the defendant, became entitled to a negro boy, Charles, then about 10 years of age. He and his brothers agreed between themselves, that if the slaves which had been the property of their father should behave well, they would each emancipate those they had got, at the age of 31 or '32. When Charles was near 30 years of age, he absconded from the service of his master, who suspected that his absence was with the knowledge of Reuben Charles. This suspicion probably was not without foundation, from the circumstance of this case, and from the character given of him by all the contending parties. In this situation, Shields agreed to sell the negro for $250, about half his value, and Charles to take his chance of getting him, on condition he, Charles, would give security for that sum, and a day was appointed to meet in Maryville for that purpose. Charles applied to Cunningham, the complainant, to be his surety, who agreed, provided he would procure one other good man to join him. On the 6th of March, 1813, a * bond was executed to Shields by Charles, with Cunningham and Harris, sureties, for the payment of .$250 *298 for the negro on the 12th of August next following. And Shields gave a bill of sale for the negro, as a slave for life. On this bond, suit was afterwards brought and prosecuted to judgment. At the date of the bond, Charles was possessed of considerable property, real and personal; but after suit, and before the judgment, he was obliged to run away on account of his crimes. Cunningham has filed his bill to be relieved from this judgment, and charges that the negro was sold as a slave for life, when he was entitled to his freedom in a short time. He also charges that Shields procured Harris to become surety under a private contract between themselves ; that Harris was in no event to be liable; but that he, Shields, would collect the whole from Charles and Cunningham; and that they thus fraudulently combined together to defraud him, and to induce him to sign the bond, which he would not otherwise have done. Shields, in his answer, insists that the negro is a slave for life, and from the production of his father’s will, with the testimony given on the cause, the fact appears to be so. Therefore this ground of equity must be abandoned, nop have the counsel insisted on it. He also denies any private agreement with Harris, to exonerate him or to induce the complainant to be surety ; but that the execution of the bond was of his own free will and accord, and at the request of Charles. The evidence is, that he agreed to be one of the sureties, provided another was procured, and shortly afterwards stated publicly that, in some difficult circumstances of his own, Charles had been his surety, and he could not refuse him. Admitting the alleged agreement between Shields and the other surety to be as stated in the bill, is he entitled to relief? It is understood that the injunction has heretofore been dissolved, * and one moiety of the judgment has been collected from each of the sureties. The object now is to have that sum refunded. I do not think him entitled to this relief. He has paid no more than, by his contract, he was bound in equity to do, and what he voluntarily agreed to risk, if Charles should fail. And whether Shields did or did not release the other moiety afterwards to Harris, cannot affect his liability. I am also induced to think that, at the time he signed the bond, he intended to dispute the' payment; for on the very day of the sale, or before the parties had all separated, one of his own witnesses deposed that he said to Shields that he had fixed himself by selling a free negro. From this circumstance, it appears as *299 probable that Charles and Cunningham had combined to overreach Shields, as that Shields and Harris had privately agreed to defraud' Cunningham. Fraud, to be relieved against, must be operative. It is not sufficient to say that an act was done with fraudulent intent. 1 It must in its effects be injurious to the party complaining ; otherwise it is not entitled to relief. Suppose, in this case, the' facts to be as stated in the bill, Cunningham’s liability will be the same as it would have been if Shields and Harris had acted with the most upright intentions. In either case, the whole debt might have been collected from him, and Hams could have been compelled to make a proportional contribution. In short, every advantage which he would have had is secure for Harris, as far as respects him, as absolutely and unconditionally bound. This bill must be dismissed.
.It is unnecessary here to say anything respecting the answer of Harris, the other defendant, for the substance of it is contained in a bill filed by him against Shields, to be relieved against the other moiety of the judgment (which it is understood he also has paid since the dissolution of the injunction). In his bill, he insists on the same ground of the negro’s * being entitled to his freedom at a certain age, to which the same answer .will apply as in the former suit. He also insists that he became surety at the request of Shields, who agreed with him not to require the payment of one cent from him, but to seek payment from the other obligors. Shields, in his answer, denies the fact of any such private agreement. That there wras some agreement that Harris should be favored respecting the payment, may be inferred from the'testimony of Trippett, to whom it appears that Shields made such proposal, and offered an indemnifying bond. But this he did not communicate to Harris till after the execution of the bond in question. After judgment, Trippett heard Shields say, at one time, if Harris had confessed judgment at the first court, he would not have made him pay anything. At another time he said, if they had confessed judgment at the -first court, he would not have been so tight on them; and gave as a reason, that perhaps he might have got his pay of Charles. George Roulstone went with Harris to see Shields, and, in conversation on the subject, Harris said what he had done was through confidence in Shields. It was'to befriend him in what he, Shields, had done. Shields answered that Harris had befriended him much; and if he had not threatened him with the gallows, he *300 would not have done as he did. It is from this testimony that the inference is drawn that there was some agreement or understanding that Hands was not, at least in the first instance, to be pressed for payment. But, on obstacles being thrown in the way of a speedy recovery, so as a chance might have been had to secure payment out of Charles’s property, the sureties were then pressed for payment by execution. That obstacles were attempted to be interposed to delay a recovery, may be inferred from Harris’s bill, wherein he appears to justify himself by alleging that a confession of judgment was no * part of the agreement. The testimony of Roulston is only that Shields said, if it had not been for a certain circumstance named, he would not have done as he did. But it will not amount to a confession that he had made any agreement beforehand to that effect. The answer of Shields to Trippett’s observation will not be of much greater force, to wit, that if he had confessed judgment at the first court, he would not have made him pay anything; especially when he gives as a reason that in that event he might have got his pay of Charles. And certainly, if a man executes a bond under such an agreement as is here alleged, there is a tacit condition annexed, that he will not attempt to delay a recovery, and thus lessen the chance of payment from his principal. Fraud, to set aside a solemn contract under, seal, ought to be very clearly and distinctly proved, and he [who] would avail himself of it ought to come before the court with pure and clean hands. For what purpose did the complainant become a surety in the bond ? He says, to befriend Harris. How so, if by agreement he was to pay nothing? Was the bond, under such circumstances, any better to Shields with his name to it than without it ? No ; but worse, as Shields might eventually lose a moiety by indemnifying him against his c'o-surety. For what purpose, then, does he allege he executed the bond ? To befriend Shields, by inducing Cunningham to become a surety. That is, in other words, he comes into this court, and avows that he combined with Shields in an attempt to defraud Cunningham, by inducing him to believe he had a co-security, who, by this statement, was only nominal. Will this court believe him in an allegation of this kind ? We say, no. This court will not interpose, and decree the money to be refunded, but leave Harris to pursue his remedy at law, in the suit which it is admitted is there depending. I omit taking notice *301 of the agreement alleged in the bill, and * denied in the answer, that Shields would purchase the property at sheriff’s sale and return it, but failed. There is no proof to that effect, and, from the bill itself, it appears that no sale had taken place at the time it was filed.
This bill must also be dismissed. The costs in each case to be paid by the complainant.
See, as to concurrence of injury and fraud, Whitson v. Gray, 3 Head, 441; Union Bank v. Osborne, 4 Hum. 413; Cunningham v. Edgefield & Ky. R. R., 2 Head, 23. See King’s Digest, 2227, 2228, 10,165, 11,990.